1   DAVID P. NEMECEK, JR. (State Bar No. 194402)
    david@qnlawgroup.com
2   YUNJI WILLA QIAN (State Bar No. 271723)
    willa@qnlawgroup.com
3   QIAN & NEMECEK LLP
    600 California Street, Ninth Floor
4   San Francisco, CA 94108
    Telephone:    (415) 475-2814
5   Facsimile:    (415) 520-2078
    Attorneys for Plaintiffs CAPITAL GROUP
6   COMMUNICATIONS, INC. and 100 PCT INC.

7                   UNITED STATES DISTRICT COURT

8                   NORTHERN DISTRICT OF CALIFORNIA

9                      SAN FRANCISCO DIVISION

10          C  13       1793

11  CAPITAL GROUP                          ——Case No.
    COMMUNICATIONS, INC. and 100 PCT
12  INC.,                                  **COMPLAINT FOR VIOLATIONS OF THE
                                           FEDERAL SECURITIES LAWS AND THE
13                                         CALIFORNIA CORPORATIONS CODE,
                                           FRAUD AND BREACH OF FIDUCIARY
14               Plaintiffs,               DUTY**

15       v.

16  XEDAR CORP., HUGH H.                   **DEMAND FOR JURY TRIAL**
    WILLIAMSON, III and IHS INC.,
17
                 Defendants.
18

19

20               **NATURE OF THE ACTION AND OVERVIEW**

21       1.      Plaintiffs Capital Group Communications, Inc. and 100 PCT Inc. bring this

22  action to redress the damages they have suffered as a result of the fraudulent share repurchase

23  scheme that was perpetrated by XeDAR Corporation and its Chairman and CEO Hugh H.

24  Williamson, III during the months leading up to the acquisition of XeDAR by IHS.

25       2.      Williamson carried out the fraudulent share repurchase scheme by

26  repeatedly soliciting Plaintiffs and other shareholders and employees of XeDAR to allow XeDAR

27  to repurchase their shares at an artificially depressed sale price while in possession of material,

28

1  non-public information that Williamson concealed from Plaintiffs and others during the course of
2  the scheme.

3            3.        During the course of negotiations regarding the sale of their shares of
4  XeDAR, Plaintiffs inquired of Williamson whether XeDAR was involved in any merger
5  negotiations or efforts to sell the company or be acquired.  Williamson told Plaintiffs that there
6  was "nothing going on" and that there was "nothing on the horizon" despite the fact that he knew
7  that IHS had expressed serious interest in acquiring XeDAR and had discussed "a path to
8  acquisition" whereby XeDAR would be acquired by IHS.  Williamson also knew that XeDAR
9  had initiated a program in October 2011 codenamed Project Zenith that was designed to initiate
10  an auction process in order to drive up the price at which IHS would ultimately agree to acquire
11  XeDAR.  Williamson also knew that XeDAR had retained the law firm of Holland & Knight LLP
12  to assist with Project Zenith, and that numerous corporations and private equity firms had
13  expressed interest in acquiring XeDAR at the time he made the misrepresentations at issue to
14  Plaintiffs.

15            4.        XeDAR repurchased 4,292,246 shares from its shareholders and employees
16  during the second half of 2011 alone.  Williamson received approximately $2 million more in
17  compensation from the sale of his shares at the close of the merger with IHS as a direct result of
18  XeDAR's repurchase of shares pursuant to its shareholder repurchase program that was initiated
19  just three months before the inception of Project Zenith.

20                                    **JURISDICTION**

21            5.        Plaintiffs bring this action pursuant to Section 10(b) of the Securities
22  Exchange Act of 1934 (the '34 Act) (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder
23  (17 C.F.R. § 240.10b-5), as well as section 20A of the '34 Act (15 U.S.C. § 78t-1), California
24  Corporation Code sections 25401 and 25402 and common law claims.

25            6.        The Court has jurisdiction over the Defendants pursuant to Section 27 of
26  the '34 Act (15 U.S.C.A. § 78aa), as well as supplemental jurisdiction over Plaintiffs' claims
27  brought pursuant to the California Corporations Code and common law claims.

28

2

1

<strong>VENUE</strong>

2   7. Venue is proper in this district pursuant to section 27 of the '34 Act (15

3 U.S.C. § 78aa). Defendants XeDAR and Williamson solicited Plaintiffs to sell the shares at issue

4 in in this district and a substantial part of the events, acts, omissions and transactions complained

5 of in this Complaint occurred in this district. At all relevant times, Defendants conducted

6 substantial business and/or committed violations of United States law by acts committed in this

7 district.

8

<strong>INTRADISTRICT ASSIGNMENT</strong>

9   8. The events, acts, omissions and transactions complained of in this

10 Complaint occurred primarily in Marin County. As such, this matter may be assigned to the San

11 Francisco Division or Oakland Division of this Court pursuant to Northern District of California

12 Civil Local Rule 3-2(c).

13

<strong>THE PARTIES</strong>

14   9. Plaintiff Capital Group Communications, Inc. ("CGC") is a California

15 corporation with its principal place of business in Sausalito, California at all relevant times

16 herein. CGC provides investor relations, communications, public relations, and strategic financial

17 consulting for publicly traded companies.

18   10. Plaintiff 100 PCT Inc. is a California corporation with its principal place of

19 business in Sausalito, California. CGC and 100 PCT are collectively referred to herein as

20 "Plaintiffs." 100 PCT also provides investor relations, communications, public relations, and

21 strategic financial consulting for publicly traded companies

22   11. Defendant XeDAR Corp. ("XeDAR") was a Colorado corporation with its

23 principal place of business in Arvada, Colorado at all times relevant herein. At all times relevant

24 herein, the XeDAR was registered with the United States Securities and Exchange Commission

25 and its stock was publicly traded on the Over-the-Counter Bulletin Board.

26   12. Defendant Hugh H. Williamson, III ("Williamson") is an individual

27 residing in or around Denver, Colorado. At all relevant times alleged herein, Williamson was the

28 Chief Executive Officer and the Chairman of the Board of Directors of XeDAR.

3
COMPLAINT

1    13.    Defendant IHS Inc. ("IHS") is a Delaware corporation with its principal

2  place of business in Englewood, Colorado.

3                           **GENERAL ALLEGATIONS**

4    14.    CGC and 100 PCT performed investor relations services for XeDAR Corp.

5  from 2007 to 2010. Plaintiffs facilitated communications between investors and XeDAR's

6  corporate management. They did so by providing market intelligence to corporate management

7  while communicating with actual and potential shareholders of XeDAR regarding the company's

8  financial strategy and strategic direction. The sole compensation that Plaintiffs received for their

9  services consisted of shares of common stock of XeDAR. CGC received 917,800 shares of

10  XeDAR and 100 PCT received 100,000 shares of XeDAR in compensation for their services.

11    15.    In January 2012, Plaintiffs were contacted by Williamson, who inquired as

12  to whether Plaintiffs would agree to allow XeDAR to repurchase their shares. Plaintiffs asked

13  Williamson whether XeDAR was involved in merger negotiations with entities that might be

14  interested in acquiring it. Williamson assured Plaintiffs that there was "nothing going on," there

15  was "nothing on the horizon," and that XeDAR might never be acquired.

16    16.    During that same conversation, Williamson warned Plaintiffs that even if

17  XeDAR was acquired, the acquisition price could be low, that he was unsure of what the

18  acquisition price would be, and there was a risk that they would not receive a profit upon the sale

19  of their shares. Williamson also informed Plaintiffs that business was "slow" and that XeDAR

20  was "not doing well." Unbeknownst to Plaintiffs, XeDAR began discussions with IHS in

21  October 2011 concerning a transaction whereby IHS would make incremental acquisitions of

22  XeDAR in connection with the development of a new product that IHS told XeDAR was "a path

23  to acquisition."

24    17.    After it began discussions with IHS regarding "a path to acquisition,"

25  XeDAR initiated "Project Zenith" in the Fall of 2011. Project Zenith was a code name used by

26  XeDAR to describe a program to market the company to potential acquirers, including IHS. The

27  primary purpose of Project Zenith was to begin an auction process to drive up the acquisition

28  price IHS would pay once it formally agreed to acquire XeDAR.

4

COMPLAINT

1    18.    In July 2011, XeDAR began repurchasing its shares from certain of its

2    shareholders at 17 cents per share pursuant to a share repurchase program that was authorized and

3    approved by its board of directors. XeDAR's management believed at that time that the shares

4    were worth significantly more than 17 cents. Pursuant to XeDAR's share repurchase program,

5    Williamson was permitted to use company funds to repurchase XeDAR shares from any

6    shareholder he desired.

7    19.    XeDAR conducted its share repurchase program while representing to its

8    shareholders that it was "not looking for acquirers" and that the investment banking firm it hired

9    to spin off one of its divisions known as Point One "thought they had exhausted the market, and

10   there were no buyers for the Geospatial business at a reasonable multiple of revenues or

11   EBITDA." XeDAR stated in its report to shareholders for the fourth quarter of 2011 that it was

12   "now fully focused and committed to growing the Geospatial business" that was acquired by IHS

13   shortly thereafter. XeDAR never corrected these representations to its shareholders after it began

14   discussing "a path to acquisition" with IHS or after it launched Project Zenith.

15   20.    At the time he began soliciting shareholders to fraudulently induce them to

16   sell their shares, Williamson was the largest shareholder of XeDAR. Williamson acquired

17   600,000 employee stock options of XeDAR in October 2011 – the same month XeDAR launched

18   Project Zenith – after he recommended and XeDAR's board approved the grant of those options.

19   Williamson oversaw and directed the fraudulent share repurchase scheme in order to line his

20   pockets and those of his fellow officers and directors once the acquisition closed in breach of the

21   fiduciary duty they owed to XeDAR's shareholders. Williamson went so far as to ask Mark

22   Bernhard, the CEO of 100 PCT, to solicit other shareholders of XeDAR for him in order to

23   convince them to allow XeDAR to repurchase their shares. XeDAR repurchased 4,292,246

24   shares from its shareholders and employees during the second half of 2011 alone.

25   21.    Based on Mr. Williamson's representations that there was "nothing going

26   on" and "nothing on the horizon" with respect to XeDAR's efforts to be acquired or sold, CGC

27   and 100 PCT agreed to allow XeDAR to repurchase their shares for 17 cents per share.

28   22.    The transaction closed on or about February 6, 2012. Prior to the close of

5

1    the transaction, XeDAR and Williamson fraudulently concealed and failed to disclose the

2    following material facts to CGC and 100 PCT that they had a duty to disclose in connection with

3    XeDAR's repurchase of the shares owned by CGC and 100 PCT:

4           a.    That in the Fall of 2011, a company known as Sapient approached

5    XeDAR and advised that it was interested in acquiring XeDAR.

6           b.    That in October 2011, XeDAR began discussions with IHS

7    concerning a possible transaction whereby IHS would make incremental investments in XeDAR

8    in connection with the development of a new product, which IHS described as "a path to

9    acquisition" of XeDAR.

10          c.    That XeDAR launched Project Zenith in October 2011, which was

11   designed to auction the company to potential acquirers in order to drive up the purchase price that

12   IHS eventually agreed to pay for XeDAR.

13          d.    That XeDAR had retained the law firm of Holland & Knight LLP

14   in or around December 2012 in order "to assist[] in going out on a no name basis to a limited

15   number of potential acquirers who should be interested in XeDAR's Geospatial Division."

16          e.    That in early 2012, a company known as Circle Capital Partners

17   and another private equity firm expressed interest in acquiring XeDAR.

18          f.    That as of January 10, 2012, XeDAR had begun working on a

19   document entitled "Potential Acquirers of Zenith" that contained the names of 27 companies,

20   including IHS.

21          g.    That in early February 2012 and before the transaction for the sale

22   of Plaintiffs' shares closed, XeDAR maintained a document entitled "Project Zenith Prospective

23   Purchase Chart" that identified 56 potential acquirers and reflected that as of February 3, 2012 the

24   Project Zenith "teaser" had been sent to 15 potential acquirers of XeDAR. The "teaser" stated

25   that "Zenith is working with Holland & Knight, LLP to complete a potential merger or sale

26   transaction."

27          h.    That on February 1, 2012, IHS expressed its objections to XeDAR

28   regarding the auction process it had initiated, and that it desired to have "a path to acquisition" of

6

1    XeDAR. IHS complained that XeDAR was trying to "shoehorn" IHS into acquiring it.

2         23.    XeDAR's efforts to "shoehorn" IHS proved successful. On March 23,

3    2012, IHS instructed XeDAR "to stop the auction process and sell us the company." XeDAR

4    agreed to do so. XeDAR did not disclose its efforts to be acquired or sold to its shareholders until

5    May 8, 2012, when it advised them that IHS's bid was superior to those from "other potential

6    purchasers solicited through the more recent sale process begun in January 2012."

7         24.    On May 11, 2012, XeDAR publicly announced that it had been acquired by

8    IHS for $28.8 million. Williamson received approximately $2 million more in compensation

9    from the sale of his shares at the close of that transaction as a direct result of XeDAR's

10   repurchase of shares pursuant to its shareholder repurchase program that was initiated just three

11   months before the inception of Project Zenith.

12                          **FIRST CAUSE OF ACTION**

13   **(Violation of Section 10(b) of the '34 Act and Rule 10b-5 Promulgated Thereunder –**

14                          **Against XeDAR and IHS)**

15        25.    Plaintiffs incorporate the allegations of paragraphs 1 through 24 as though

16   fully set forth herein.

17        26.    Defendant XeDAR engaged in a plan, scheme, and unlawful course of

18   conduct pursuant to which it knowingly and recklessly engaged in acts, transactions, practices and

19   courses of business which operated as a fraud on Plaintiffs. XeDAR made untrue statements of

20   material fact and omitted to state material facts necessary in order to make the statements made,

21   in light of the circumstances under which they were made, not misleading, which operated as a

22   fraud and deceit upon Plaintiffs.

23        27.    The purpose and effect of XeDAR's scheme was to induce Plaintiffs to

24   agree to allow XeDAR to purchase their shares at an artificially depressed price while concealing

25   the material facts that XeDAR had been discussing a "path to acquisition" with IHS and had

26   initiated an auction process to drive up the price of the acquisition of XeDAR by IHS, and by

27   misrepresenting to Plaintiffs that there was "nothing going on" and "nothing on the horizon" with

28   respect to that process.

                                7

28.     Plaintiffs did not know of the falsity of the misstatements by XeDAR and Williamson, did not know the facts which were omitted that XeDAR and Williamson were required to disclose, and relied on the untrue statements of fact in making the decision to allow XeDAR to repurchase the shares they owned. Plaintiffs' reliance upon the misrepresentations made by Williamson was reasonable for several reasons. Plaintiffs had a direct line of communication with Wiliamson when they were managing investor relations for XeDAR until they ceased performing those services in 2010. They continued to communicate with Williamson regarding the affairs of XeDAR after they stopped serving in that role. Williamson routinely kept Plaintiffs informed of ongoing developments at XeDAR and repeatedly transmitted information to them regarding the sale of one its divisions known as Point One in May 2011. The sole shareholders of CGC and 100 PCT, Devin Bosch and Mark Bernhard, had every reason to believe that Williamson would have disclosed the existence of merger negotiations or other material developments taking place at XeDAR at the time he contacted them if such events were taking place as was his practice.

29.     IHS is liable for the untrue statements, omissions, manipulative and fraudulent activities and fraudulent course of conduct by XeDAR as the successor in interest of XeDAR.

30.     As a direct and proximate result of the untrue statements, omissions, manipulative and fraudulent activities and fraudulent course of conduct by Defendants, Plaintiffs have suffered damages in an amount to be proven at trial, but not less than $950,000.

## SECOND CAUSE OF ACTION

### (Violation of Section 20A of the '34 Act – Against All Defendants)

31.     Plaintiffs incorporate the allegations of paragraphs 1 through 30 as though fully set forth herein.

32.     XeDAR and Williamson were in possession of material, non-public information concerning XeDAR when they solicited Plaintiffs to allow XeDAR to repurchase their shares.

33.     XeDAR violated section 10(b) of the '34 Act and Rule 10b-5 promulgated

8

1  thereunder by way of its offer to repurchase and its repurchase Plaintiffs' common shares while in
2  possession of material non-public information regarding XeDAR without disclosing said
3  information to Plaintiffs.

4           34.     Williamson is jointly and severally liable with XeDAR for his failure to
5  disclose material, non-public information he had a duty to disclose in connection with the
6  repurchase of Plaintiffs' shares of XeDAR. Williamson is also liable as a "control person" of
7  XeDAR as that term is defined in section 20(a) of the '34 Act.

8           35.     IHS is liable for the untrue statements, omissions, manipulative and
9  fraudulent activities and fraudulent course of conduct by XeDAR as the successor in interest of
10  XeDAR.

11           36.     As a direct and proximate result of the untrue statements, omissions,
12  manipulative and fraudulent activities and fraudulent course of conduct by Defendants, Plaintiffs
13  have suffered damages in an amount to be proven at trial, but in no case less than $950,000.

14  ## THIRD CAUSE OF ACTION

15  ## (Violation of Section 20(a) of the '34 Act – Against Williamson)

16           37.     Plaintiffs incorporate the allegations of paragraphs 1 through 36 as though
17  fully set forth herein.

18           38.     Williamson acted as a controlling person of XeDAR within the meaning of
19  section 20(a) of the '34 Act. By virtue of his position as CEO and Chairman of the Board of
20  Directors with XeDAR and ownership of XeDAR stock, Williamson had the power and authority
21  to use XeDAR to engage in the wrongful conduct complained of herein. XeDAR controlled
22  Williamson and all of its employees. By reason of such conduct, Williamson is liable pursuant to
23  section 20(a) of the '34 Act.

24  ## FOURTH CAUSE OF ACTION

25  ## (Violation of California Corporations Code Section 25401 – Against All Defendants)

26           39.     Plaintiffs incorporate the allegations of paragraphs 1 through 38 as though
27  fully set forth herein.

28           40.     In offering to repurchase and in repurchasing Plaintiffs' shares of XeDAR,

9

1   XeDAR made untrue statements of material fact and omitted to state material facts to Plaintiffs.

2          41.     The misstatements and omissions referred to herein were "material facts"

3   within the meaning of California Corporations Code section 25401 because they were facts that a

4   reasonable investor would consider in deciding whether to sell their shares.

5          42.     XeDAR's offer to repurchase and repurchase of the common shares at

6   issue of XeDAR were by means of misrepresentations and omissions within the meaning of

7   California Corporations Code section 25401.

8          43.     XeDAR's misrepresentations and omissions of material facts took place

9   "within the state" of California within the meaning of Corporations Code section 25008.

10         44.     Defendant Williamson materially aided XeDAR in violating Corporations

11  Code section 25401 and is therefore liable pursuant to Corporations Code section 25504.

12         45.     IHS is liable for XeDAR's violations of Corporations Code section 25401

13  as the successor in interest of XeDAR.

14         46.     As a direct and  proximate result of Defendants' violations of Corporations

15  Code section 25401, Plaintiffs have suffered damages in an amount to be proven at trial, but in no

16  case less than $950,000.

17                            **FIFTH CAUSE OF ACTION**

18  **(Violation of California Corporations Code section 25402 – Against All Defendants)**

19         47.     Plaintiffs incorporate the allegations of paragraphs 1 through 47 as though

20  fully set forth herein.

21         48.     XeDAR and Williamson were in possession of material information that

22  was not generally available to the public that they knew would significantly affect the market

23  price of Plaintiffs' shares at the time XeDAR repurchased those shares.

24         49.     XeDAR and Williamson did not disclose the material, non-public

25  information in their possession to Plaintiffs before Plaintiffs allowed XeDAR to repurchase their

26  shares.

27         50.     XeDAR and Williamson did not have reason to believe that Plaintiffs were

28  also in possession of the material, non-public information that they failed to disclose at the time

                                          10

1  Plaintiffs allowed XeDAR to repurchase their shares.

2       51.   At the time of the repurchase of Plaintiffs' shares of XeDAR, Williamson

3  was an officer, director, and controlling person of XeDAR and is therefore liable under

4  Corporations Code section 25402.

5  **SIXTH CAUSE OF ACTION**

6  **(Fraud – Against All Defendants)**

7       52.   Plaintiffs incorporate the allegations of paragraphs 1 through 51 as though

8  fully set forth herein.

9       53.   During the course of the negotiations concerning the repurchase of

10  Plaintiffs' shares of XeDAR, Williamson made misrepresentations of fact to Plaintiffs.  At the

11  time Williamson made misrepresentations of fact to Plaintiffs, he was acting within the course

12  and scope of his employment as the CEO of XeDAR.

13       54.   Specifically, Williamson represented to Plaintiffs that there was "nothing

14  going on" and "nothing on the horizon" with respect to merger negotiations and the efforts of

15  XeDAR to be acquired or sold in a merger.

16       55.   Williamson knew the statements referenced in the paragraph immediately

17  above were false when he made them.  Specifically, Williamson knew that IHS had expressed

18  serious interest in acquiring XeDAR and had discussed "a path to acquisition" whereby XeDAR

19  would be acquired by IHS.  Williamson knew that XeDAR had initiated Project Zenith in order to

20  drive up the price at which IHS would ultimately agree to acquire XeDAR and that XeDAR had

21  retained the law firm of Holland & Knight to assist with that process.  Williamson knew that

22  several corporations and private equity firms had expressed interest in acquiring XeDAR at the

23  time he made the misrepresentations at issue.

24       56.   In making the misrepresentations described in paragraph 55 above,

25  Williamson intended that Plaintiffs rely upon them in order to induce Plaintiffs to allow XeDAR

26  to repurchase their shares.

27       57.   Plaintiffs reasonably relied upon the misrepresentations made by

28  Williamson in making their decision to sell their shares of XeDAR.

11

1    58.    As a direct, substantial, and foreseeable result of the misrepresentations

2    made by Williamson, Plaintiffs have been damaged in an amount that exceeds $950,000.

3    59.    IHS is liable for the fraud committed by XeDAR as its successor in

4    interest.

5    60.    Defendants conduct in committing the acts described herein was

6    fraudulent, malicious and oppressive, and warrants an award of punitive damages.

7                          **SEVENTH CAUSE OF ACTION**

8                  **(Fraudulent Concealment – Against All Defendants)**

9    61.    Plaintiffs incorporate the allegations of paragraphs 1 through 60 as though

10   fully set forth herein.

11   62.    XeDAR and Williamson fraudulently concealed the facts that IHS had

12   expressed serious interest in acquiring XeDAR and had discussed "a path to acquisition" whereby

13   XeDAR would be acquired by IHS. Williamson knew that XeDAR had initiated Project Zenith

14   in order to drive up the price at which IHS would ultimately agree to acquire XeDAR and that

15   XeDAR had retained the law firm of Holland & Knight to assist with that process. Williamson

16   knew that several corporations and private equity firms had expressed interest in acquiring

17   XeDAR at the time he fraudulently concealed the material facts at issue.

18   63.    XeDAR and Williamson had a duty to disclose to Plaintiffs during the

19   course of soliciting them to sell their shares of XeDAR that IHS had expressed serious interest in

20   acquiring XeDAR and had discussed "a path to acquisition" whereby XeDAR would be acquired

21   by IHS. Williamson knew that XeDAR had initiated Project Zenith in order to drive up the price

22   at which IHS would ultimately agree to acquire XeDAR and that XeDAR had retained the law

23   firm of Holland & Knight to assist with that process, and that numerous corporations and private

24   equity firms had expressed interest in acquiring XeDAR at the time he made the

25   misrepresentations at issue.

26   64.    Defendants had the opportunity before the close of the transaction for the

27   sale of the Plaintiffs' shares to disclose the facts that that IHS had expressed serious interest in

28   acquiring XeDAR and had discussed "a path to acquisition" whereby XeDAR would be acquired

12

1  by IHS. Williamson knew that XeDAR had initiated Project Zenith in order to drive up the price
2  at which IHS would ultimately agree to acquire XeDAR and that XeDAR had retained the law
3  firm of Holland & Knight to assist with that process, and that numerous corporations and private
4  equity firms had expressed interest in acquiring XeDAR at the time he made the
5  misrepresentations at issue, yet they failed to do so.

6      65.    Plaintiffs did not discover the material facts described in paragraph 64
7  above until after the close of the transaction for the repurchase of their shares by XeDAR.

8      66.    IHS is liable to Plaintiffs as the successor-in-interest of XeDAR.

9      67.    As a direct, substantial, and foreseeable result of the fraudulent
10  concealment of material facts by XeDAR and Williamson, Plaintiffs have been damaged in an
11  amount that exceeds $950,000.

12     68.    Defendants' conduct in committing the acts described herein was
13  fraudulent, malicious and oppressive, and warrants an award of punitive damages.

14              **EIGHTH CAUSE OF ACTION**

15          **(Breach of Fiduciary Duty – Against All Defendants)**

16     69.    Plaintiffs incorporate the allegations of paragraphs 1 through 68 as though
17  fully set forth herein.

18     70.    XeDAR and Williamson owed Plaintiffs a fiduciary duty by virtue of their
19  status as shareholders of XeDAR. A fiduciary relationship existed between XeDAR and
20  Williamson on the one hand, and Plaintiffs on the other hand at all relevant times described herein
21  until the close of the sale of Plaintiffs' shares of XeDAR.

22     71.    XeDAR and Williamson breached the fiduciary duty they owed to
23  Plaintiffs by making the misrepresentations and fraudulently concealing the material, nonpublic
24  information described herein for purposes of carrying out their fraudulent scheme to repurchase
25  as many shares of XeDAR as possible before the close of XeDAR's merger with IHS and profit
26  from that repurchase.

27     72.    IHS is liable for XeDAR's breach of the fiduciary duty it owed Plaintiffs as
28  the successor in interest of XeDAR.

13

73.     As a direct, substantial, and foreseeable result of the breach of fiduciary duty owed to Plaintiffs by XeDAR and Williamson, Plaintiffs have been damaged in an amount that exceeds $950,000.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

1.     For general damages sustained as a direct, proximate and foreseeable result of the wrongful conduct of Defendants in an amount according to proof that shall exceed $950,000.

2.     For an award of punitive damages for Defendants' malicious, oppressive and outrageous conduct in an amount according to proof.

3.     For attorney's fees and costs of suit incurred herein; and

4.     For such other and further relief as the court may deem proper.

### JURY DEMAND

Plaintiffs demand a trial by jury.

Dated:  April 19, 2013                                    QIAN & NEMECEK LLP

By: _____
DAVID P. NEMECEK, JR.
YUNJI WILLA QIAN
Attorneys for Plaintiffs CAPITAL GROUP
COMMUNICATIONS, INC. and 100 PCT INC.

14

COMPLAINT