IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAPITAL GROUP COMMUNICATIONS INC,<br><br>Plaintiff,<br><br>v.<br><br>XEDAR CORP,<br><br>Defendant. | No. C -13-01793 EDL<br><br>**ORDER DENYING MOTION TO COMPEL ARBITRATION AND TO DISMISS** |

Pending before the Court is Defendants' Motion to Compel Arbitration and to Dismiss or Alternatively Stay the Action in Favor of Arbitration. (Dkt. 16.) For the reasons set forth below, the Court denies Defendants' motion.

**I.     Background**

Defendant Xedar Corp. ("Xedar") is a Colorado corporation involved in geospatial technologies and government consulting. (Compl. ¶ 11; Defs.' Mot. at 2, Dkt. 16.) On January 9, 2007, Xedar hired Plaintiff Capital Group Communications, Inc. ("CGC") to provide Xedar with investor relations services pursuant to a Consulting Agreement. (Bosch Decl. ¶ 2, Dkt. 22-1; Williamson Decl. ¶ 2, Dkt. 16-2.) Plaintiff 100 PCT, Inc., ("100 PCT") worked with CGC to provide these investor relations services. (Bernhard Decl. ¶ 2, Dkt. 22-2.) The Consulting Agreement expired on January 9, 2008, and the parties extended it to January 2010. (Consulting Agreement ¶ 1, Dkt. 16-3; Consulting Agreement Extension, Dkt. 16-4; Bosch Decl. ¶ 3.) CGC was not retained to provide Xedar with investor relations services after January 2010. (Bosch Decl. ¶ 4.)

Under the Consulting Agreement, Xedar paid CGC in shares of Xedar stock. (Consulting

Agreement ¶ 4.) CGC received 917,800 shares and 100 PTC received 100,00 shares.[1] (Compl. ¶ 14.) This compensation scheme was set forth in a paragraph of the Consulting Agreement titled "Remuneration." In addition to providing that CGC would be paid in stock, this paragraph stated that:

> Further, if and in the event the Company [Xedar] is acquired in whole or part, *during the term of this Agreement*, it is agreed and understood Consultant [CGC] will not be requested or demanded by the Company to return any of the shares of Common Stock paid to it hereunder. It is further agreed that if at any time *during the term of this Agreement*, the Company or substantially all of the Company's assets are merged with or acquired by another entity, or some other change occurs in the legal entity that constitutes the Company, the Consultant shall retain and will not be requested by the Company to return any of the shares.

(Consulting Agreement ¶ 4 (emphasis added).)

The Consulting Agreement contained arbitration and choice-of-law provisions. Xedar and CGC agreed that "[a]ny controversy or claim arising out of or relating to this Agreement, or the alleged breach thereof, or relating to Consultant's activities or remuneration under this Agreement shall be settled by binding arbitration in Denver, Colorado." (Id. ¶ 14.) They also agreed that the Consulting Agreement would be "governed by, construed and enforced in accordance with the laws of the State of Colorado." (Consulting Agreement ¶ 13.) As noted above, the Consulting Agreement expired in January 2010.

Two years after the Consulting Agreement expired, Plaintiffs sold their Xedar stock back to Xedar for $0.17/share. (Bosch Decl. ¶ 8; Bernhard ¶ 8.) This sale was made pursuant to stock repurchase agreements emailed to Plaintiffs by Defendant Williamson, Xedar's CEO, who drafted them with the assistance of counsel. (Bosch Decl. ¶ 8, Ex. A; Bernhard Decl. ¶¶ 7-8, Ex. A.) These stock-repurchase agreements did not contain any arbitration provision. In May 2012, Defendant IHS acquired Xedar for $28.8 million. (Compl. ¶ 24; Defs.' Mot. at 4.) As a result of the acquisition, Xedar shareholders received more than $0.17/share. (Compl. ¶ 24; Defs.' Mot. at 4.)

While the parties do not dispute the basic terms of the share repurchase agreements set forth

---

[1] 100 PTC received these shares from CGC; 100 PTC did not enter any contracts with Xedar for the provision of investor relations services. (Bernhard Decl. ¶ 2.)

2

above, they do disagree as to whether they were procured by deception. Plaintiffs allege that in January 2012, Williamson asked Plaintiffs whether they would be willing to sell their shares of Xedar stock. According to Plaintiffs, they asked Williamson if Xedar was involved in merger negotiations, and Williamson denied it. Plaintiffs also allege that contrary to Williamson's denial, Xedar had in fact taken numerous steps toward being acquired but disclosed none of these steps to Plaintiffs during the share repurchase negotiations. (Compl. ¶¶ 15-21.) Plaintiffs allege that based on Williamson's representations that there was "nothing going on" with respect to an acquisition, they agreed to sell their Xedar stock for $0.17/share. (Id. ¶ 21). Defendants deny these allegations. (Defs.' Mot. at 4.)

In April 2013, Plaintiffs brought the present case against Defendants for fraud, violations of federal securities laws, and violations of California statutes. Plaintiffs' claims are all premised on Defendants having fraudulently concealed or failed to disclose material facts in connection with the share repurchase transactions. Defendants assert that Plaintiffs allegations parrot those from a case pending in Colorado federal court, Xedar v. Rakestraw, 12-01907 CMA BNB. Defendants now move to compel arbitration of Plaintiffs claims under the arbitration clause in the Consulting Agreement. The Court held a hearing on this motion on July 16, 2013, at which the Court denied Defendant's motion to compel arbitration.

**II. Legal Standard**

　　A.　　Federal Arbitration Act

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., governs the Consulting Agreement. The FAA mandates that written agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable, save upon such ground as exist at law or in equity for the avoidance of any contract." 9 U.S.C. § 2. In deciding whether a dispute is arbitrable, a court must consider: (1) whether a valid agreement to arbitrate exists; and (2) whether the scope of that agreement to arbitrate encompasses the claims at issue. Chiron Corp. v. Ortho Diagnostic Sys., 207 F.3d 1126, 1130 (9th Cir. 2000). If a party seeking to compel arbitration establishes these two factors, the court must compel arbitration. Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 218 (1985) ("By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates

3

that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.") (emphasis in original). When a contract contains an arbitration clause, there is a presumption of arbitrability such that doubts should be resolved in favor of coverage. AT&T Techs. v. Commc'ns Workers of Am., 475 U.S. 643, 650 (1986). This presumption is particularly strong in the case of broad arbitration clauses. Id.

Although "[q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration," Ticknor v. Choice Hotels Int'l, Inc., 265 F.3d 931, 936 (9th Cir. 2001), "a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*." Granite Rock Co. v. Int'l Bhd. of Teamsters, 130 S.Ct. 2847, 2856-57 (2010) (emphasis in original); AT&T, 475 U.S. at 648 ("The first principle gleaned from the [Steelworkers] Trilogy is that 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'") (quoting Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960)). Thus, a court applies the presumption of arbitrability "only where a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand" and "only where the presumption is not rebutted." Granite Rock, 130 S.Ct. at 2858-59; see also Mundi v. Union Sec. Life Ins. Co., 555 F.3d 1042, 1044-45 (9th Cir. 2009) ("The presumption in favor of arbitration does not apply 'if contractual language is plain that arbitration of a particular controversy is not within the scope of the arbitration provision.'") (quoting In re Tobacco Cases I, 124 Cal. App. 4th 1095 (Cal. Ct. App. 2004)).

B.     State Law Regarding Arbitration

Although the FAA "creates a body of federal substantive law of arbitrability, enforceable in both state and federal courts and pre-empting any state laws or policies to the contrary," Ticknor, 265 F.3d at 936 (internal quotation marks omitted), courts generally apply state-law principles of contract interpretation. See, e.g., First Options v. Kaplan, 514 U.S. 938, 944 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally (though with a qualification we discuss below) should apply ordinary state-law principles that govern the formation of contracts."). A court applying state law contract interpretation principles must, however, give due regard to federal policy by resolving ambiguities as to the scope

4

of the arbitration in favor of arbitration. Mundi, 555 F.3d at 1044. But see Coenen v. R.W. Pressprich & Co., 453 F.2d 1209, 1211 (2d Cir. 1972) ("Once a dispute is covered by the [Federal Arbitration] Act, federal law applies to all questions of interpretation, construction, validity, revocability, and enforceability.").

California law and Colorado law, like federal law, strongly favor enforcement of arbitration provisions. In California, "[a] heavy presumption weighs the scales in favor of arbitrability; an order directing arbitration should be granted 'unless it may be said with positive assurance that the arbitration provision is not susceptible of an interpretation that covers the asserted dispute.'" Gravillis v. Coldwell Banker Residential Brokerage Co., 143 Cal. App. 4th 761, 771 (Cal. Ct. App. 2006). Doubts are resolved in favor of sending the parties to arbitration, and arbitration agreements are to be liberally interpreted. Id. Nevertheless, "[t]he policy in favor of arbitration does not apply when the contract cannot be interpreted in favor of arbitration. Id.; see also Lawrence v. Walzer & Gabrielson, 207 Cal. App. 3d 1501, 1506 (Cal. Ct. App. 1989) ("[A] party cannot be compelled to arbitrate a dispute he has not agreed to submit.").

Similarly, under Colorado law, all doubts whether a dispute is arbitrable are resolved in favor or arbitration. Lane v. Urgitus, 145 P.3d 672, 677 (Colo. 2006) (citing In re Marriage of Popack, 998 P.2d 464, 467 (Colo. 2000)). Colorado courts compel arbitration unless they can say "'with positive assurance' that the arbitration clause is not susceptible of any interpretation that encompasses the subject matter of the dispute." Allen v. Pacheco, 71 P.3d 375, 378 (Colo. 2003). A broad arbitration clause makes the strong presumption favoring arbitration apply with greater force. Id.

### III. Discussion

Although the Consulting Agreement contains a Colorado choice-of-law provision, and the share repurchase agreements do not contain any choice-of-law provisions, the parties do not address which, in addition to the FAA, governs their dispute. However, California and Colorado are in accord. Regardless of which law is applied, the arbitration clause in the Consulting Agreement does not encompass the share repurchase transactions at issue in this case.

    A.    Agreement to Arbitrate

5

1 The first step in the analysis is to determine whether a valid agreement to arbitrate exists. Chiron Corp., 207 F.3d at 1130. It is undisputed that the Consulting Agreement contains a valid arbitration clause.

B. Scope of Arbitration Agreement

Defendants argue that Plaintiffs' claims arise out of and relate to the Consulting Agreement because Plaintiffs obtained the Xedar shares, whose resale is at issue, through the Consulting Agreement, which provides that claims relating to Plaintiffs' remuneration are subject to arbitration. Defendants also argue that one of Plaintiffs' jobs under the Consulting Agreement was to assist Xedar with its efforts to be acquired, and Plaintiffs' allegations relate to Xedar's acquisition. Defendants further contend that the Consulting Agreement addresses the disposition of the Xedar shares in the event that Xedar is acquired, which is precisely what Plaintiffs are suing over. (Defs.' Mot. at 7; Defs.' Reply at 2-3.)

Plaintiffs counter that their claims have nothing to do with the Consulting Agreement. Plaintiffs point out that their claims do not involve the parties' performance under the Consulting Agreement or the compensation paid under it. Plaintiffs also note that the Consulting Agreement had expired well before the share repurchase transactions, and in any event the Consulting Agreement was silent regarding repurchase of the shares. Plaintiffs also point out that Xedar required Plaintiffs to enter into separate agreements without an arbitration clause for the stock repurchase. (Pls.' Opp. at 11.)

Although the arbitration provision in the Consulting Agreement is broad, it is not infinite. Plaintiffs' claims do not "arise out of" the Consulting Agreement because the alleged misrepresentations about Xedar's acquisition plan have nothing to do with the parties' performance of the Consulting Agreement or its interpretation (other than the arbitration provision itself) or the amount or the use of Plaintiffs' compensation thereunder. The compensation issue was fully resolved some two years before the separate transactions to repurchase Plaintiffs' shares pursuant to new, separate agreements. These agreements are the only ones the Court needs to interpret, and they lack arbitration provisions. Similarly, Plaintiffs' claims to not arise out of or relate to any breach of the Consulting Agreement; none is alleged.

6

1  Further, it is undisputed that Plaintiffs stopped providing Xedar with consulting services in
2  January 2010, when the Consulting Agreement expired. Even if Plaintiffs' contractual duties
3  included assisting Xedar with acquisition efforts, they ended in January 2010, and Defendants have
4  not pointed to any relationship between Plaintiffs' earlier efforts and the acquisition that occurred
5  two years after the Consulting Agreement expired. Put simply, Plaintiffs' allegations that
6  Defendants misrepresented the status of Xedar's acquisition do not implicate Plaintiffs' contractual
7  duties under the Consulting Agreement.

8  Defendants make a clever argument based on the remuneration portion of the arbitration
9  provision, but it ultimately fails. The Consulting Agreement provides that any controversy or claim
10 "relating to Consultant's . . . remuneration under this Agreement shall be settled by binding
11 arbitration." (Consulting Agreement ¶ 14.) Defendants argue that Plaintiffs' claims necessarily
12 "touch upon" the Consulting Agreement because if one substitutes the phrase "Xedar shares" for
13 "remuneration" in the arbitration provision, the question becomes "does this lawsuit arise out of or
14 relate to Plaintiffs' Xedar shares." (Defs.' Reply at 3.) Defendants' answer is "of course it does."
15 (Id.)

16 Defendants' remuneration argument proves too much. According to Defendants' logic, if
17 Plaintiffs had been compensated in cash, all future disputes between the parties that related to cash
18 would be subject to arbitration. It is unreasonable to attribute such a broad scope to the arbitration
19 provision at issue here, especially when it is not repeated, or even referenced, in the share repurchase
20 agreements themselves. Moreover, the Remuneration Paragraph of the Consulting Agreement is
21 limited in scope. It provides that if Xedar is acquired "during the term of the [Consulting]
22 Agreement," Xedar will not ask CGC to return is shares of Xedar stock. (Consulting Agreement ¶
23 4.) Had the parties meant for the Consulting Agreement to govern Plaintiffs' disposition of their
24 shares in the event of Xedar's acquisition at any time in the future, they would not have specifically
25 limited this provision to the duration of the Consulting Agreement. See, e.g., Telenor East, 567 F.
26 Supp. 2d 432 at 440 (noting that a narrow provision in the agreement at issue suggested that the
27 defendants' "sweeping" interpretation of an arbitration provision was unreasonable).
28 Finally, the parties' course of conduct shows that they did not intend the arbitration provision

7

in the Consulting Agreement to encompass claims regarding share repurchase transactions that were the subject of separate agreements entered into long after the original agreement expired. The new agreements that actually governed the share repurchase transactions do not contain any arbitration provisions. Defendants were represented by counsel in drafting these agreements. If the parties intended to arbitrate disputes about the share repurchase, these agreements would have reflected this intention. Instead, Defendants rely on a separate contract that expired two years earlier.

**IV.  Conclusion**

Plaintiffs' claims based on alleged misrepresentations inducing them to sell their shares back to Defendants pursuant to new agreements fall outside the scope of the arbitration provision in the original Consulting Agreement. Accordingly, the Court denies Defendants' motion to dismiss.

**IT IS SO ORDERED.**

Dated: August 5, 2013

*Elizabeth D. Laporte*
ELIZABETH D. LAPORTE
United States Magistrate Judge